Good morning, Your Honors. Adele Kachkalades on behalf of Ladera. I will try to save seven minutes for rebuttal. I'm going to start with the contract interpretation issue in this case because if you agree with me that the intercreditor agreement does not entitle Hall to Ladera's title insurance, then Hall's entire cross appeal is moot and you don't even need to reach my argument that Hall failed to adequately disclose its damages computation. Now, I think Hall's cross appeal in this case rather highlights the absurdity of its position. Not only is Hall trying to treat Ladera and Ladera's title insurers as essentially guarantors of Hall's senior loan to the borrower, but Hall is also asking the court to determine a mechanism whereby Hall can negotiate with Old Republic, the title insured directly, to obtain Ladera's title insurance. I think the very fact that Hall is requesting that makes it clear that there is no mechanism spelled out for that in the intercreditor agreement, and that's because the intercreditor agreement was never intended to give Hall a right to Ladera's title insurance. So unlike property insurance, Hall was a named beneficiary on all the property insurance documents, and it does have a right to negotiate with the property insurer directly, but it was never named as a beneficiary of Ladera's title insurance, and it never even requested to be named as a beneficiary because Hall had his own title insurance. And, in fact, did any loan documents between Ladera and Hall or the borrower require Ladera to buy any title insurance? No. There wouldn't be any reason they would care. No. Ladera bought title insurance to protect itself, and that's exactly our problem with what Hall is trying to get in this case. So Hall had its own title insurance, right, and it lost its own lawsuit against Old Republic because coverage for prior mechanics liens were specifically excluded from Hall's policy, and I submit that's precisely because Hall knew about Penta's prior construction work on the property. And the Fifth Circuit called Hall a real chutzpah for even bringing the lawsuit against Old Republic. I submit they're even more of a chutzpah in this case for turning around and suing Ladera for Ladera's title insurance policy. I think it's telling in this case. I researched this issue to death. I haven't seen a single case cited by Hall. I haven't found a single case in which a court has held that a senior lender is entitled to a junior lender's title insurance under an inter-creditor agreement, and I think that would establish terrible precedent in the lending industry. There would be no incentive for a junior lender to ever go purchase its own title insurance. Well, it would all, I mean, the question, it would easily be solvable by explicit contractual language, right? I would grant you that. If there were, and I think that's the other problem in this case. Hall drafted the inter-creditor agreement. It's 30 pages, single-spaced, and Hall can't point to a single reference where it says the word title insurance, let alone a provision entitling Hall to Ladera's title insurance. Well, it says junior lenders shall release insurance proceeds and condemnation awards to be applied to the restoration of the property or to payment of the indebtedness, so that seems to touch all insurance proceeds. Well, I disagree. I think if you read that provision as a whole, to be applied to the property, that's not what title insurance does. I mean, to me, this is a classic property insurance provision, and if you read the rest of the sentence. Or to the payment of indebtedness, yeah. Yeah, but there's nothing in Ladera's title insurance that goes to paying the indebtedness of Hall's, of borrower's loan to Hall, which is what the indebtedness under the senior. Well, it's not limited to Hall's indebtedness, isn't it? It says, or to payment of the indebtedness evidenced and secured by the senior loan documents. That is the indebtedness to Hall. And there's nothing in our title insurance that goes to that, and I think Hall concedes that in their reply brief. And if you go on, that sentence says, in the same manner as senior lender so that no conflicts are created. Again, to me, this is a classic property insurance provision where the senior lender, junior lender, and the borrower all have an interest in the property insurance, and Hall is basically saying, we get to decide how to apply that. If we want to restore the property, or if we want to use it to pay off our loan, but we get to decide that. But this, I mean, if you continue in that paragraph, it talks about all proceeds of such insurance related to the property. I mean, it's all about property insurance. And I think. Well, the title, hold on, back up on that. Title insurance is related to the property. Well, yeah, I think this gets into Hall's other argument. I guess it's related in kind of a but-for sense. I think this paragraph itself, you know, talking about replacing any part of the property or restoring the property, is describing property insurance. I admit we wouldn't have title insurance if we didn't, you know, have the junior loan, but I don't think that payment of title insurance somehow pays down the junior loan. You know, I'll address this point. And it are. Why couldn't it have been contemplated that title insurance of the junior lender would have been used to pay down the debtedness of the senior lender? I mean, as I read this document, it's basically, the whole point is that the senior lender gets paid whole first before the junior gets paid anything. That's the intent of it. I agree with that by the borrower. And if you look at this agreement, it's signed by Hall, Lederer, and the borrower. It's not signed by the title insurer. And so when it says, you know, Hall shall be paid first before any payment is made on account of the junior debt, the only possible person that can bind is the borrower, Hall and Lederer, right? I mean, Old Republic never agreed to this, and they're not named on our policy with Old Republic. What I'll say is, yes, our policy with Old Republic says, you know, I guess our title insurance is capped at the amount of indebtedness of the junior loan. And so if the borrower had made any payments on the junior loan, which it never did, but if it had, you know, that would what our title insurer pays us. But the converse is not true. Nothing in Lederer's contract with the borrower says if we somehow get a title insurance payment, that reduces what you owe to us. That's just simply not the case. Because title insurance is something fundamentally different. It doesn't insure payments. It's not even a, you know, a mortgage guarantee policy. It doesn't payments on the underlying loan. It insures the priority, you know, of our lien position. And we, it was meant to insure that we had a second place priority. Which in this case, I mean, I think the equities are especially egregious here because Hall knew about Penta's prior work on the property. Lederer didn't. Hall knowingly accepted that risk and included, and was the drafter of provisions in the contract saying that no work of any kind had been done on the property. And that's what Lederer relied on. And this is my issue with the summary judgment ruling in this case. Judge Jones, the district court basically said, you need to rely on these red flags instead of the contract language itself. Well, here we had the contract language that we were relying on. All the case law that I found in Texas says, yes, of course, you can't rely on an that contradicts the written language. And there's case law saying if what was so important to you, you know, was this specific provision, you should have included it in the contract. Well, here, the contract, I mean, what we relied on was in the contract multiple times that said no work of any kind has been done on the property, especially by Penta. And that was material to Lederer because that representation made us think there was no possible, you know, prior lien by Penta. When in fact there was, and Hall knew about it, and Hall was the one who chose in the borrower's bankruptcy, Hall thought Penta's position was strong enough that it entered a settlement with them, paid Penta basically its full lien about. Hall took the rest of the money and Lederer was left nothing. Could I ask you a couple of questions to follow up on that? What was the extent of Penta's lien at the time of the closing of the loans versus the later default? Yeah. So, I mean, I don't, I think at most it was like $130,000 something. That's the one number we see in the spreadsheet. Right. Well, and I don't even think the spreadsheet shows that clearly. But right, and the reason why, you know, Judge Jones said, oh, you know, you should have looked at this spreadsheet, but the spreadsheet lists Penta under pre-construction design. Yeah. I don't want to get tied up in those factual disputes about the counterclaims, but I want to understand how the lien grew from minimal work up to $8, $6, $7, $8 million. $7, $8 million. Yeah. They got over $8 million in the bankruptcy because Penta was the general contractor. So that gives them priority for their intervening. Right. They tied back the later work to this. And I'm saying that's why it's particularly important to us that the spreadsheet and the memorandum the district court relied on didn't say Penta had done. It said, yeah, this boiler room had been replaced in some work, but we didn't know it was Penta. So if it was any other contractor, low-level contractor, we're thinking a minimum lien that could have been paid off easily. The only way it ballooned into $8 million was because it was Penta, the general contractor. That's an interesting point. Yeah. So, because like you're suggesting that even if they knew there was some construction done by someone, no one would have known that it would have been on the hook for $9 million. Exactly. Exactly. But Hall didn't know that. So a couple of other things to clean up. Where does the record show the junior debt having been extinguished? That's something you assert in your briefs. Is that in the final bankruptcy order? Yeah. Confirmation of the bankruptcy plan. My point there is just that any payment we received now from the- If you'd bear with me for just another moment, I want to understand how some of the different issues here relate to each other. Okay. Suppose, for example, we disagree with you about the terms of the intercreditor agreement, but we agree that there would be factual issues on your counterclaims. Then we need to send things back for a trial that could effectively negate the claim under the intercreditor agreement, correct? Correct. Reverse and remapping. Then, this is really a question for both sides, but does anybody see any viable legal theory for splitting the title insurance 50-50? No. I perfectly well understand why the district judge did what he did, but here it's all or  Yes. As much as I would hate to have Hall get more money, I think there's no legally defensible argument to uphold the district judge's position. Either they get our title insurance or they don't, but there's no world- And it hasn't been there, right? Has Old Republic paid in, like on an interpleader or anything like that yet?  Okay. All right. Thank you. Okay. So, I'll just touch on ... I think we hit the points that, yeah, Old Republic was not a party to the intercreditor agreement, and the intercreditor agreement itself doesn't mention title insurance. Now, my second argument is, even if you disagree with me on the interpretation of the intercreditor agreement, Hall itself pled as damages that they were entitled to LIDER's title insurance up to the amount that Hall was made whole. Now, that's my other problem in this case. The only solid numbers I have is Hall admitted in sworn testimony that it dispersed under $20 million. How much under? I still don't know, but under $20 million. It admits that it was paid over $27.4 million in the bankruptcy. So, you do the math, but by my math, they've not only been repaid what they lent, but they've made a handsome profit as well. To the extent they're claiming interest and fees and penalties that they're entitled to more than that, at a minimum, my client was entitled to see the spreadsheet, the documents supporting that, supporting what was added back into that loan. We know from testimony that millions of dollars of attorney's fees were put into the principle of the loan and then accrued interest on that, but we didn't see all the invoices for what those attorney's fees were for. For limited ones, we did see they had included fees against the guarantors in a separate lawsuit, things that should never have been included in this case. And I'm saying under Rule 26, I mean, they're the ones who listed this in their initial disclosure as damages. I'm saying they had to provide a computation of what they were owed and they had to provide documents to us where we could verify. You know, one of the problems I have with their cross-appeal, when they're asserting they're entitled to all these prepayment penalties, I have to see the amounts that were dispersed and the dates of those amounts to even verify if a prepayment penalty would come into play and how much it would be and when it burned off, as they're alleging, and the bankruptcy. But I don't have those documents to verify that. And so, you know, my second argument is even if they were theoretically entitled to some amount of damages, they failed their disclosure obligations and the district court essentially ignored, you know, the mandate of Rule 37 that that evidence is precluded. Could I ask you, when would you say before the trial, this is an unusual process, okay, I get that, but when before the trial would you say the district court had what I will loosely call the last clear chance to fix this problem and to compel pretrial disclosure of the damages calculations and support in time for you all to prepare adequately? It probably still would have been too late, but at least at the motion eliminate stage, when I brought this issue up, I guess the district court could have theoretically postponed the trial, ordered the disclosure, let us do some supplemental, you know, expert discovery on it and then held the trial. But essentially, the district court said, I agree with you, they've failed to disclose this. How in the world, that was his quote, how in the world hell are we going to proceed a trial on this? But let's proceed anyway. And we literally had people pulling out calculators on the stand. I've never seen anything like it. I'm seeing these numbers and calculations for the very first time. And my client tried to submit a supplemental, you know, declaration and spreadsheets after trial and Judge Jones wouldn't allow it, which I don't blame him, but it was only to ameliorate the prejudice of these last minute numbers. So that's why I'm asking, because it was Judge Jones that like kind of prompted all this, who was Fonte, why wouldn't it be substantially justified not to be able, not to turn over the evidence in advance? Because Hall is the one who listed this as damages in their initial disclosures. And Rule 26 says, even without a discovery, you know, request, you have to provide this information. You have to provide a computation. Well, unless it's substantially justified, right? Not to. And if the district court springs this on both parties, you know, last minute, that seems like a substantial justification. Well, but I think Hall had failed to disclose first. I pointed it out in my motion in limine. You know, Judge Jones still had us go to trial, but I don't think Judge Jones caused them not to disclose the documents, you know? Well, I thought the whole point is that at trial, they weren't seeking to prove up the damages and it was only Judge Jones requiring them to do so. Well, I think that it was their burden to prove the damages. I mean, they say they were seeking only declaratory release. Right. That's what I thought. And not subrogation, but that's not true. If you read their complaint and even what they're asking in this appeal, they're literally asking to stand in the shoes of Ladera and negotiate with Ladera's title insurer. That is subrogation. And under Texas law, they have to prove that amount of their subrogation claim. They don't just get to come in and, you know, ask for some vague ruling, I don't think. I think they had to. Why couldn't they? Couldn't they just get a declaratory judgment, then go to insurance, and then figure it all out afterwards? That's what I thought that they were trying to do. Maybe they were trying to do that, but I think they shot themselves in their foot when in their own Rule 26 disclosures, then they described their damages as the amount of insurance, you know, up to the amount they were made whole. I mean, they put that in their own in the section on damages, you know. To me, if I were seeking purely declaratory relief, I would have just said, I'm not seeking damages in this action. I'm seeking a declaration as to the mechanics of the intercreditor agreement. But that's not how they did it. I'll save the rest of my time for rebuttal. May it please the Court, I'm Frank Wright on behalf of Hall, CA, NV, LLC, Appley, and Cross Appellate in this case. And as you aptly pointed out, the CA and the NVs this property set on the state line. Couldn't have been a bigger disaster than sitting on a state line and impacting laws in two different states. And I may be the only lawyer that dates all the way back to the beginning of this. I was there when the bankruptcy was filed. This case has been going on now since that bankruptcy for nine years. I think the record is, there's no dispute that my client is in the senior lien position. There's no dispute that Ladera is in a junior lien position. And that the parties had an intercreditor agreement. And that intercreditor agreement did what most intercreditor agreements do, and it provided for a complete subordination of the debt of the junior lender to the senior lender. And I'll jump right into, I mean, we're talking about the insurance. I think when you look at the entirety of that document, and you look at the recitals, and you look at 3A and 3B, and then the specific provisions on insurance, there is no carve out, no exclusion for title insurance. So if that's, if that's, there's nothing explicit, but how do you account for the fact that nothing in the documents requires Ladera to buy title insurance, let alone to do it for the benefit of Hall? It wasn't required to buy title insurance or property insurance. Either one. There wasn't any provision for property insurance? No, no. Senior lender gets the property insurance. Of course. Right. Of course. But property insurance was required under the loan agreement, I assume. Right. And so if you look at the insurance provisions, what other type of insurance could they be addressing other than title insurance? Junior lenders don't buy property insurance. They buy title insurance, just like the senior lender buys title insurance. Wasn't the junior lender also an insured on the property insurance? Should have been. Should have been, yeah. I don't know. I can't say that for a fact. They should have been. They should have been, yeah, of course. Right. That's what everybody would expect. So you've told us in your briefs that this case is not exceptional, but that it is vital to the lending industry. So can you point us to any other case? Your friend on the other side said she hadn't found one. Can you point us to a case like this one in which a senior lender is able to get access to the title insurance of a junior lender? I cannot. Unprecedented in annals of Anglo-American law at this point? I have not seen any other senior lender that has attempted to obtain the title insurance of the junior lender. Wow. Okay. That sounds, the question is sort of what, if you're telling us we need to read the whole document contextually, which is what I understood you to be saying, the structure of the transaction, the relationships among the parties would seem to suggest that this purely optional title insurance that the junior lender buys on its own initiative with its own money was not really contemplated by the borrower or the senior lender. I think what was contemplated is that both parties were going to get title insurance. I think what may not have been contemplated is that the senior lender's title insurance was going to be ineffective. Well, that's your problem, right? Well, that is a problem. However, you have a document that says that they cannot receive a payment from any source. The way that's written is extremely broad, right? And so the way that some of these provisions are written, if they were to receive a payment from another property entirely, it has to go to you before it goes to them. If they received a payment from another source that was being applied to their debt. Now, they make an argument that this is not... No, or for the benefit of the holder of the junior debt. Not necessarily on account. That's the last part of the sentence. I'm looking at one, let's see, where am I? 1B, right? About eight lines, seven, eight lines down. For any payment of any character shall be made on account of the junior debt or otherwise to or for the benefit of the holder or holders of the junior debt. Right. Doesn't have to be for the account. Right. So if they've got a deal in Arizona that pays them money under this language, if we take it literally, you get it, right? That's absurd, right? If you take it literally, it is very broad, yes. It's absurdly broad. So we can't take this stuff too literally. Right. But I think you can take it that if they're receiving a payment on title insurance, it clearly is on account of their debt. There's no other reason you have title insurance than the fact that you have debt. But they're saying the debt has disappeared by this time. And it had not disappeared. And here's the reason, it hadn't disappeared any more than Hall's debt disappeared. You had to close it. It's been discharged. We had it discharged as to the debtor. They still had a guarantee claim they could pursue. Their debt didn't go away. They can still chase a guarantor. They can still chase the title company. Can I go back to something you said? You said there's no reason to get title insurance other than to secure the debt. Is that true? I mean, don't you buy title insurance to ensure that you actually have the home? Even if I went and paid cash for a home, I'd still go get title insurance to make sure that I have title of the house. If you're a lender, you're getting title insurance to secure your loan and to secure the priority of your loan. And so that's why they got it. So does a homeowner not ever get title insurance or these are just separate? They're separate buckets. They're separate topics. Homeowners do get title insurance. They get title insurance to ensure that they've got it. But the lender, your point is where here we're talking about the lender, it wouldn't make sense for any other. They don't care. I mean, I guess they do care about the underlying title to the home. They want to make sure that's accurate. Correct. But they're getting title insurance for the amount of their loan. They're not getting it for...  Exactly for the amount of their loan, which is why we're dealing with a title insurance policy for $6 million, which as you noted, Judge Jones just split it. And there was no basis to split it. You agree. I agree. There's no basis to split it. This is totally contrary to a subordination agreement. So just going back to your point before, even if the junior debt was discharged, wouldn't the title insurance still be paid on account of it? Because on account of seems to be a very broad language. Yes. And again, as I was trying to point out, the debt is discharged as to the borrower. The debt is not discharged as to a guarantor. Is there a guarantor in this case? Yes, there is. Who is that? I think they had Radovan. There were two developers involved. We had guarantees from both Criswell and Radovan, both developers. We got an $8.6 million judgment. Okay. So the junior debt still existed, just that it was discharged against the borrower. So even if, you know, regardless of the bankruptcy, that it was still entitled, the proceeds of the title insurance was still on account of the junior debt. Correct. That's your argument. Because it still existed as to the guarantor. Right. And Old Republic. But even, can I ask though, even if it wasn't, even if there was no guarantor and it was discharged, then would you say it's not on account of the junior debt? No, I would say it was still on account of the junior debt because the title company is going to be looking at that debt. What they're going to be looking at is what was your damage? You don't necessarily just get $6 million. In other words, how were you damaged because there was a lien that popped in front of you? And there was never a determination that Penta had a lien superior to Ladera. There was never a determination that Penta had a lien superior to Hull. It was settled. There was an issue raised and it was settled. Y'all had asked the question, what was the original amount of that debt? Okay, about $150,000, which had been paid. There was still some equipment on the site. Work had been done. This is at the time of closing. Right. This was at the time of the original loan closings. Yeah, yeah. All right, and then over time, after Hull stopped funding because the loan went into default, the borrower racked up another, I think it was over $10 million because we settled, as I recall, and I'm working off memory, I think it was $8 million is what we settled that Penta could receive out of the proceeds. Just to get that litigation gone so we could close the deal. Can you, unless my colleagues have other questions, can you address the counterclaim issue? Because I do think that that was problematic, that just a simple notice of pre-construction costs, I don't know if that, given all the other representations, I just don't know if that isn't enough to require due diligence. I think where Judge Jones came out on the counterclaim when he was ruling on that, when he looked at the undisputed facts, and the undisputed facts he had in front of him is that Ladera lent money on this property before Hull ever made a loan. They already were in, okay? They'd made an initial loan, Hull then made a loan, and Ladera loaned additional money. So they were already a lender. Ladera had conducted its own independent due diligence with respect to the property. Ladera was represented by counsel. But what about the representations that said that, I think it was in Pantera, I forget the name of the construction company.  Penta, sorry. Penta did not do any prior work. There was a representation by Penta to Hull in those loan documents that it had not done any prior work. That was not a representation by Hull to Ladera. This is a representation made by a borrower to the senior lender in the loan documents, which turned out to be false. But Ladera has offered evidence that you all knew it was false, right? They have offered evidence that we were aware that there was construction activity, just like we'd offered evidence that they were aware there was construction activity, and that their Ladera clients lived near the property and saw the property, went on site on the property. That's all they did. All sounds a lot like a factual dispute to me. What Judge Jones found is that based on these facts and based on the fact that the representation they were relying on was in a document that was not a rep made to them, that there was no basis for justifiable reliance. And so as he sorted through and looked at each and every statement that they were lying on. How do you make, what do you count for the argument that, well, even if they knew there was construction, they didn't know it was Penta, and then therefore they didn't know that they would be on the hook for what, eight to nine million dollars? Penta would get eight to nine million priority over senior and junior lenders. I would represent that neither Hall nor Ladera knew. Well, that's the whole point. Then why is this not the jury's question? It's not a jury question because if you look at the knowledge that, this is undisputed facts, okay? If we have to look at the undisputed facts, and the undisputed facts are that Ladera already had knowledge. They had knowledge of their own. They had knowledge that they evidenced. Not necessarily that Penta was doing the construction. Right. They had knowledge. If you look at the confidential memorandum that was referenced in the record, they had knowledge of that. There was an exchange of emails between the two principals of Ladera with respect to that, and that three million dollars had been spent on the property. So they had knowledge. Three million. I think it was 300,000. Yeah, three million. I remember. Yeah, that's nothing. I mean, you look at that and like, okay, whatever. But I didn't know it ballooned to eight to nine million dollars. But if you're a lender, you have to be careful because of, and again, this gets back to the difference in the state laws. Nevada has very different laws for general contractors than California does. I do want to touch on some other things in the record. We haven't complained about how he got to his dollar amount, even though it was kind of interesting, but he had a basis for it. And so when you look at how did he get to three and a half million dollars, which he then reduced to in his oral ruling, he reduced it to three point two million. And then in his written ruling, he reduced it to three million dollars. How did he get there? He took two major pieces of evidence, both of which were totally well known to Ladera because they were parties to the bankruptcy case. He took Hall's proof of claim and he took a sworn affidavit that was that was filed of public record by Hall within a month of the closing. And he took those two and he had 24.8 million on the proof of claim and then 32 million in the affidavit, 16 months apart. Okay, so how does that amount get there? It gets there because Hall was still funding money, advancing cost during the bankruptcy because interest was continuing to create a default rate of interest and because of legal fees. And so as Judge Jones worked through it, he then deducted, we think improperly, the two bankruptcy fees. You're entitled to prepayment fees as a lender in bankruptcy if you accelerated the debt before the bankruptcy, which Hall did. So can I back you up though, counsel? Yes. Reading the transcript of the two fellows you had testify about damages, was it Payne and I've gone blank on the... Mike Jaynes. Jaynes, yeah, Jaynes and the other fellow. I've never, I would expect maybe to see calculators sometimes used in cross-examination but not indirect on damages as they're making adjustments as they go. And I would appreciate it if you could address the Rule 26 disclosure problem, not at the outset of the case, not at trial, but in preparing for the trial on damages. Yeah, at the number one, I mean, the case had been going on for years, with discovery for four years. That's all fine. You're obligated as the plaintiff to set out numbers and provide the backup. Except that we never were seeking a judgment against Lidera on our debt. We weren't. We were seeking a declaratory judgment. You were seeking money at the trial ordered by the judge. That's why I'm not worried about the outset of the case. Come to the weeks and months coming up to the trial when you kind of have the last clear chance you can avoid this train wreck. And we relied on, as I said, we relied on the primary documents was a proof of claim. Where did you show this as your Rule 26 disclosure? It was in our exhibits. In exhibits, okay. And in your trial, were those disclosed ahead of trial? Yes. Yes. In other words, all the pleadings in the bankruptcy case were disclosed ahead of trial. Okay. You're not really allowed to just sort of give the other side a stack of documents, right? You're supposed to lay out your damage claim and the support for it. Where did that happen? Or where do we have a district judge finding that your failure to do so was either substantially justified or harmless? We laid it out after he told us that he was going to try the issue. And he did this at the summary judgment ruling. He decided at summary judgment stage that, because he asked me point blank. He said, so when are we going to decide the dollar amount? And I said, that'll come up after we go after the insurance. To me, that's a separate issue. We've asked for a declaratory judgment. We're entitled to the insurance. The insurance company is going to probably push back and say, we're only willing to pay X dollars and so on. And that's when that dollar amount will come into play. And he said, no, I want to try it now. And so then that did switch gears. Now we've got to go try this issue. And we provided the other side with the bankruptcy proof of claim. We provided them with the affidavit that Mike Jaynes had filed in the bankruptcy case. That was the closest in time evidence. Is your argument that no disclosure obligation was incurred by you until the district court said that? Is that basically what you're saying? Yes. Because that's why you're saying, we didn't disclose it earlier. We only disclosed it then. So your claim is you just satisfied the disclosure requirements. Although that doesn't seem to be consistent with the rule. I mean, I understand why you put it out there then. This might have been sort of invited error by the district court. But it doesn't seem like you complied with the disclosure rules as set out in the rules themselves. I would say that, well, we did produce a lot of documents. And we did provide the other side with, I mean, obviously the bankruptcy case was it. We had plans. We had all kinds of stuff that was coming out of the bankruptcy case. Because we were seeking a claim for breach of contract. Well, if we send it back because of the splitting issue, could there be a new calculation of what the damages are? So even if we agreed with you, because how the district court split it, if we say that that was completely wrong, we remand it back for a new calculation of damages, would then, could this all be fixed that way? It could be fixed. But I think it's got to be fixed with direction. So the... You don't want to be up here again on that, do you? No, no. So if you go back to the base of $3 million and we take off the... And we just start with that. And so that's an okay starting point because that's how he rationalized down to that number. He still needs to add back in the exit fee, the prepayment fee. And then he didn't run interest. Interest continues to run. Debts don't stop until they're paid off in full. And he didn't run any interest from the time of the closing in 2018 until the time he handed down a judgment in 2023. That interest alone would have pushed this debt above $6 million. And then he just decided no on legal fees. And we were seeking legal fees as a... I know I'm at the end of my time. As a breach of contract damage claim, he found that there was a breach in the summary judgment ruling. But you didn't appeal any of that. So that's not before us. We're not... No, we didn't appeal that. What I'm saying is we did appeal the issue of legal fees, that he did not award legal fees. You're right. Okay. And I'm just saying there was two bases. The reason we tried the legal fees, it was a damage claim for the breach of contract he'd already found. But we also were seeking his prevailing party legal fees. And then he just said, well, they're not reasonable, so I'm giving you zero. Never found an amount. And our position is he had an obligation to find an amount. If we send it back, there's more errors that you want to be corrected. Thank you. All right. Thank you. First, I'd like to address the language on account of the junior debt or for the benefit of the holders of the junior debt. My point in our briefing, maybe I was too cute in arguing that the debt was extinguished, but my point was essentially after the bankruptcy, right, any payment we receive, it doesn't, it cannot reduce what the borrower owes us. The borrower doesn't owe us anything anymore. And it's not in our capacity as the junior debt holder. But even if you credit what Hall says, that let's say the debt still exists. It's still out there. Our title insurance doesn't reduce what the borrower or the guarantors owe. And in fact, our title insurance policy with LIDERA, there's a subrogation clause there. So let's say, I mean, with Old Republic. So let's say Old Republic pays LIDERA title insurance. Then Old Republic, if they still think there's a viable claim against the borrower or guarantor, they can go out and sue them. But to me, that just shows that them paying us doesn't diminish what the borrower or guarantors owe us. You know, Old Republic can go seek that if they think there's something collectible out there. I'll also point out, I think this is a largely academic discussion because this was LIDERA's guarantee agreement and even the loan with borrower was largely non-recourse. Meaning, if there was a deficiency after foreclosure, we couldn't sue the borrower personally or the guarantors personally except for limited exceptions. This is at 8 ER 1788, if you want to look at section 6.3 of our loan agreement. But basically, our only security was our, you know, our lien position so that we could foreclose on the property. And that's why title insurance was like triply important to us at this case. It guaranteed our lien position. Now, Hall says, you know, there was never a determination that Penta, you know, had lien priority. Well, Hall essentially made that determination when it settled with them and we were pushed to third position and got nothing. But that's exactly why we had title insurance and between us and our title insurance, that was our covered risk. You know, that's why they need to pay it. I want to quickly address, you know, Hall's argument that Penta made the representation that no work of any kind had been done. We have evidence in the record. I mean, Hall wrote the script and got somebody else to say the line. But Hall can still be liable for fraud, even if it gets a third party to say the line. You know, we put evidence in the record. Hall's counsel had discussions with Penta. Penta says, we won't agree with this because this is false. Hall says, well, let's change the wording and say under this agreement, no work of any kind has been done. Penta says, okay, but then it read the capital A agreement that actually refers to prior agreements. So I think it's a bit rich of Hall to say that somebody else made it. And finally, if I could just address the proof of claim and the affidavit from the bankruptcy matter, they were just numbers. You know, it's a proof of claim with certain numbers written on it, but we still didn't have anything substantiating what made those numbers up or proving, you know, that the principal number on that was accurate and the principal number kept changing on various bankruptcy documents. Okay. Thank you. Thank you to both counsel for your arguments in the case. The case is now submitted and that completes our arguments for the day. Thank you.
judges: Hamilton, NELSON, BUMATAY